**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

GREGORY A. ESSICK, SR.,

       Plaintiff,

                              Case No. 3:14-cv-949-J-34JRK

vs.

FIDELITY NATIONAL INFORMATION
SERVICES, INC., and CERTEGY, INC.,

       Defendants.

_____/

## O R D E R

    **THIS CAUSE** is before the Court on Defendants Fidelity National Information Services, Inc.'s and Certegy, Inc.'s Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 24; Motion), filed on November 30, 2015. In the Motion, Defendants request summary judgment in their favor on all claims pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)). Plaintiff Gregory A. Essick, Sr. (Essick) filed a response in opposition to the Motion on December 23, 2015. <u>See</u> Plaintiff's Response to Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 36; Response).[1] Accordingly, this matter is ripe for review.

---

[1] Defendants filed their exhibits in support of the Motion as a separate entry on the docket. <u>See</u> Defendants Fidelity National Information Services, Inc. and Certegy, Inc.'s Notice of Filing Deposition Excerpts, Deposition Exhibits, and Declarations in Support of Defendant's Motion for Summary Judgment (Doc. 25). Likewise, in support of his Response, Essick separately filed his declaration, as well as deposition excerpts. <u>See</u> Plaintiff's Notice of Filing Deposition Transcripts [in] Opposition to Defendant's Motion for Summary Judgment (Doc. 34); Plaintiff's Notice of Filing Amended Declaration in Opposition to Defendant's Motion for Summary Judgment (Doc. 35; Essick Decl.). At the Court's request, the parties also filed complete copies of the deposition transcripts. <u>See</u> Joint Notice of Filing Deposition Transcripts (Doc. 44), filed June 6, 2016. For ease of reference, the Court will cite to these exhibits using the abbreviations designated by the parties in their Notices.

## I.   Standard of Review

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Rule 56(c)(1)(A).[2]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).  "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go

---

[2] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged.  The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.    Background[3]

As an initial matter, the Court observes that Defendants Fidelity National Information Services, Inc. (FNIS) and Certegy Inc. are actually one entity pursuant to a February 1, 2006 merger between Fidelity National Information Services, Inc., a subsidiary of Fidelity National Financial, Inc. (FNF), and Certegy, Inc.  See Phillips Decl. ¶¶ 3-7.  Prior to the merger, in April 2003, Plaintiff Gregory Essick, who is African American, was working for ALLTEL Information Services, Inc. when that entity was acquired by FNF and re-named Fidelity Information Services, Inc. (FIS).  See First Amended Complaint (Doc. 15; Amended Complaint) ¶ 7, filed September 2, 2014; Defendants Fidelity National Information Services, Inc. and Certegy, Inc.'s Amended Answer and Affirmative and Other Defenses

---

[3]  As discussed above, because this case is before the Court on Defendants' motion for summary judgment, the facts recited herein and all reasonable inferences therefrom have been viewed in a light most favorable to Essick.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

to Plaintiff's First Amended Complaint (Doc. 21; Answer) ¶ 6, filed July 23, 2015; P. Dep. 1 at 39-40; Phillips Decl. ¶ 2.  Following his employment with FIS, Essick went to work for Certegy, Inc.  See Essick Decl. ¶ 8.  While Essick was working for Certegy, it merged with, and changed its name to, FNIS.  Id. ¶ 9; Phillips Decl. ¶¶ 5-7.  Further discussion of the complicated history of Defendant's corporate restructuring is unnecessary to the resolution of this matter as the parties do not dispute that the correct entity is before the Court.  See Phillips Decl. ¶¶ 2-7.  For clarity, the Court will distinguish between Essick's employers by referring to them as FIS (from 2003-2005), Certegy (prior to the merger), and FNIS (after FNIS merged with Certegy).  The Court will refer to all of these entities collectively as Defendant.

Essick was employed with FIS as a "Senior Automated Messaging Analyst," which was "basically a Lotus Notes administrator."  See Essick Decl. ¶ 1; P. Dep. 1 at 42-43. Essick had no issues with his employment until he was assigned a new supervisor, Jason Winters.  See Essick Decl. ¶ 2.  According to Essick, "Winters openly denigrated my work in front of peers and colleagues, refused to provide me training opportunities, refused to provide me assignment-critical equipment as was provided peers and colleagues, and omitted me from group settings in a way that seemed designed to single me out as compared to Caucasian peers."  See Essick Decl. ¶ 2.  As such, in December 2003, Essick filed a complaint with the FIS human resources department describing Winters' unfair treatment of him, as well as the unprofessional behavior of a co-worker, Don Witt, and "outlining a belief of racial bigotry and discrimination."  See Essick Decl. ¶ 3; P. Dep. 1 at 48, 52; P. Dep. 2 at 23-24, Ex. 3 (the HR Complaint).  Among other things, the HR Complaint details an incident where Essick's co-workers were provided with "a Blackberry

RIM/Cell phone," but his request for the same device was denied "due to budget issues." See HR Complaint; see also P. Dep. 1 at 48, 79-80.  Essick also complained that he did not receive the same training and growth opportunities as Witt.  See HR Complaint; P. Dep. 1 at 48.  Essick believes that Winters' actions were based on Essick's race because "[t]here was another employee in the department named Silvia Horan and, basically, the two minority employees . . . were being treated different.  We were harassed and treated differently by members.  They went to lunch and they excluded us from the lunches."  See P. Dep. 1 at 49.  Essick references Horan in his HR Complaint, notes that she had recently been dismissed, and observes that "the two minorities are the one[s] who have the greatest struggles here."  See HR Complaint.

Following the HR Complaint, FIS transferred Essick to a different supervisor, first Mark Cato, and then, at some point in the second half of 2004, Vickie Gouin.  See P. Dep. 1 at 130-31, 138; P. Dep. 2 at 41-42.  According to Essick, after he complained of race discrimination to human resources, he was "subjected to efforts to retaliate against [him]," including "manufactured reasons for performance corrective action, lowered review scores, and continued denigration of my work and person."  See Essick Decl. ¶ 4.  Essick recalls that immediately after filing the HR Complaint the way he was treated changed—he was isolated and excluded from lunches or activities with other team members, received "false write-ups," and people stopped wanting to associate with him.  See P. Dep. 1 at 45-46.  In addition, Essick states that the people he had accused of race discrimination, Winters and Witt, who were still in his work environment, were "blatantly hostile," going out of their way to find problems with Essick's work.  Id. at 47.  Indeed, Essick received additional work "so they could try to find something wrong," followed by reports to Jay Johnson, the manager

of their group, that Essick was making errors. Id. However, Essick maintains that Johnson told him that when he investigated these reports "their claims just [dis]integrated." Id.

Notably, in an email to human resources on July 8, 2004, Essick complained about retaliation from his "former team and manager" with respect to his evaluation. See P. Dep. 2 at 35-37, Ex. 8. Specifically, Essick believed Cato, his supervisor after Winters, "downgraded" his evaluation in retaliation for the HR Complaint. See P. Dep. 2 at 36-37. In the email, Essick complained that he "felt betrayed by the process" because he faced "open retaliation for going to HR and it [was] allowed." See P. Dep. 2, Ex. 8. In early 2005, Essick received another negative evaluation, this time from Gouin, his supervisor after Cato. Again Essick perceived this evaluation as retaliation against him for the 2003 HR Complaint. See P. Dep. 2 at 42-46, 48, Ex. 14. Johnson, who managed Gouin, agreed with Essick that the evaluation was unfair and assisted him in preparing a response. See P. Dep. 2 at 43-44, 46. At some point, both Gouin and Johnson left their positions in Essick's group, such that Essick's appeal of the negative evaluation went to his new manager, Linda Lander. See P. Dep. 2 at 42-44. According to Essick, Lander did not fairly review Johnson's feedback, so her role "whether active or passive" also constituted retaliation.[4] Id. at 46. At the time Lander reviewed his appeal, Essick firmly believed he was being retaliated against for the HR Complaint, but maintains that he had no proof. Id. at 50. Finally, on May 10, 2005, Lander issued a "Final Written Warning" to Essick, signed by both Lander and Bridget Farris, a senior vice president for FIS, located in Little Rock, Arkansas. See P. Dep. 2 at 50-51, Ex. 15. Essick responded to Farris and a human resources representative that he felt this warning was part of a pattern of retaliation against

---

[4] Essick maintains that Lander knew of his previous HR Complaint because he told her about it. See P. Dep. 2 at 47.

him.  See P. Dep. 2 at 10-12; P. Dep. 1 at 72-73.  Feeling that he was being "forced out," Essick began looking for new employment soon after receiving the Final Written Warning, and left FIS one or two months later.  See P. Dep. 2 at 52; P. Dep. 1 at 72.

Upon leaving FIS, Essick went to work for Certegy as a global messaging architect where he managed "globally [a] 17,000-person Domino–Lotus Notes Domino environment."  See P. Dep. 1 at 43.  Essick started at Certegy as a temporary contractor and after three or four months, in October of 2005, Certegy offered him a permanent position.  See P. Dep. 2 at 54, Ex. 16.  A few months later, following the February 1, 2006 merger, Essick found himself once again working for Defendant, now known as FNIS.  See Phillips Decl. ¶¶ 5-7.  At the time of the merger, FNIS was "using Microsoft Exchange and had migrated away from Lotus Notes, and the plan was to migrate all Lotus Notes systems to Microsoft Exchange."  See Flynn Decl. ¶ 6.  As such, Essick, who maintained the Lotus Notes operating system, was "advised that it was anticipated that [his] employment with [FNIS] would end on a date certain in the future . . . ."  Id. ¶¶ 5-6.  Indeed, Essick received a letter dated March 27, 2006, in which FNIS informed him that his employment would terminate on a specific date.  See P. Dep. 2 at 60.  Before the termination date arrived, Essick received another letter, dated July 24, 2006, in which FNIS informed him that his termination date had been extended to January 31, 2007.  Id. at 60-62, Ex. 22.  In a letter dated December 22, 2006, FNIS informed Essick that his termination date was extended once again to June 15, 2007.  See id. at 64, Ex. 24.  However, upon receiving the December 2006 extension letter, Essick began looking for other employment, and on April 3, 2007, Essick gave notice of his resignation.  See id. at 85-86, Ex. 32; Gimse Dep. at 66-67.  Essick's employment with FNIS ended on April 13, 2007.  See Essick Decl. ¶ 12.

During his time at Certegy, Essick initially reported to Don Thomas.  <u>See</u> P. Dep. 2 at 54-55.  Due to a reduction in force, Thomas' employment with FNIS ended in October or November of 2006, <u>see</u> Thomas Dep. at 6, 23-24, and Essick then reported to Christopher Gimse.  <u>See</u> Gimse Dep. at 48.  In early 2007, Gimse prepared an evaluation of Essick for the 2006 year with an overall rating of "Meets Expectations."  <u>See</u> Flynn Decl. ¶ 9.  In an early draft of the evaluation, Gimse gave Essick an overall "Exceeds Expectations" review, but after Gimse discussed the evaluation with Gimse's manager, Michael Flynn, Gimse lowered some aspects of the evaluation to the "Meets Expectations" rating.  <u>See</u> P. Dep. 1 at 121; P. Dep. 2 at 82; Flynn Decl. ¶ 10; Gimse Dep. at 91-107. According to Flynn, it is his "normal practice" to have his subordinates, such as Gimse, review with him the evaluations they prepare for employees under their supervision before finalizing the evaluation.  <u>See</u> Flynn Decl. ¶ 10.  Flynn's involvement in Gimse's evaluation of Essick is significant because Flynn was Cato's manager at FIS during the time period when Cato was assigned to supervise Essick following the HR Complaint.  <u>See</u> P. Dep. 2 at 82-83.  As such, because of Flynn's involvement, Essick believed the reduction in his evaluation was retaliation for the 2003 HR Complaint.  <u>Id.</u> at 82.  Nonetheless, both Gimse and Flynn maintain that they were unaware of any complaints Essick had made about racial discrimination or being treated differently than other employees.  <u>See</u> Gimse Dep. at 53; Flynn Decl. ¶ 11.

Gimse explains that a "Meets Expectations" rating is still considered a "very good rating" and that Essick's evaluation was "a very good review."  <u>See</u> Gimse Dep. at 90, 108. According to Gimse, Flynn gave him guidance on how to properly score an evaluation which led to changes in several categories from "exceeds expectations" to "meets

expectations," resulting in an overall evaluation of "meets" rather than "exceeds" expectations.  See Gimse Dep. at 91-107.  For example, Gimse states that:

> when I originally went through the review, you know, I–I was more than happy to give [Essick] high marks, you know.  I enjoyed working with him and, you know, I want to try to help him succeed.  But when I went through the review with [Flynn], we talked about some of the issues that we had with the [project Essick worked on.] . . . Although he worked a lot of hours, I think he probably could have taken a more proactive approach in some of these . . . .
>
> So with that being said, he definitely met expectations in supporting the environment; there were definitely some issues with the environment.  I think if he had proactively prevented all of those issues that occurred, it would have put him up in the 'exceeds expectations.'"

See Gimse Dep. at 92-93.  Gimse summarizes that "pretty much all of the ratings that were lowered were, you know, based on the impact that we felt in the [project Essick worked on], based on how it was managed and, you know, maybe not – well, taking the methodical approach to ensure that our change doesn't cause impact."  Id. at 111.  Notably, Flynn's feedback to Gimse with respect to one of the evaluation categories led Gimse to raise Essick's rating in that category from "meets" to "exceeds" expectations.  See id. at 97-98.  Gimse emphasizes that Flynn "never told me to change a rating," only that they had "open, honest conversations about each objective and, you know, standard process."  Id. at 110. Gimse maintains that he still engages in that process for all his reviews.  Id.  As a result of his "meets expectations" evaluation, Essick was given a slight pay increase.  See P. Dep. 2 at 84-85; Flynn Decl. ¶ 9.

Upon leaving FNIS, Essick took a job with U.S. Food Services.  See P. Dep. 1 at 14.  He worked there for approximately a year, until he was laid off.  Id. at 15.  Shortly after leaving U.S. Food Services, Essick began working for M&I Bank.  Id. at 16.  He worked there for approximately a year until he was laid off in December 2008 or January 2009.  Id.

at 16-17.[5]   According to Essick, he had a conversation with Don Thomas in December 2008,[6] which confirmed Essick's suspicions that Defendant had retaliated against him and prompted Essick to further investigate the matter.   See P. Dep. 1 at 57-58, 63, 77-78, 124-25; P. Dep. 2 at 87-88.   Specifically, Thomas informed Essick that prior to the merger with Certegy, Thomas met with Bridget Farris and was told that Essick had worked at FIS before and they had terminated him.   See Thomas Dep. at 8-9.   Thomas told Essick that "the people there are not his friends," and that "they wanted [Thomas] to have him terminated or to fire him prior to the close of the merger."   Id. at 9.   According to Thomas, this sentiment was repeated "by other people several times throughout the whole entire process of due-diligence . . . ."   Id.   Thomas was given the impression that Essick had been terminated

---

[5] Essick contends that while he worked for M&I Bank he was told by an unidentified co-worker that someone working for Defendant had provided a negative reference about Essick to M&I Bank.   See P. Dep. 1 at 92-93.   Specifically, Essick explains that Defendant purchased a company from M&I Bank called Metavante, and "spread that misinformation to them and they talked to people at M&I Bank because they had been partner companies for many years."   Id. at 92.   Essick believes that this negative information is directly related to M&I Bank's subsequent decision to terminate his employment.   Id. at 92-94; P. Dep. 2 at 90.   However, the only evidence of this is Essick's testimony that an unidentified co-worker at M&I Bank allegedly said that someone employed by Defendant had shared negative information about Essick.   See P. Dep. 1 at 93, 96; P. Dep. 2 at 90.   Such testimony is inadmissible hearsay, to which Defendant has objected, see Motion at 12 n.4, and the Court will not consider it.   See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." (internal quotation and footnote omitted)); see also Federal Rules of Evidence 801-802, 805.   Although, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form," see Macuba, 193 F.3d at 1323 (internal quotation omitted), the burden lies with the proponent of the evidence to "show that the material is admissible as presented or to explain the admissible form that is anticipated," see Rule 56, Advisory Committee Notes to 2010 Amendments, Subdivision (c)(2).   Essick does not argue that this evidence is admissible as presented, nor does he explain how he could present this evidence in admissible form at trial. Essick's assertion that he "continues to search for evidence of this person's location so that admissible evidence may be gained from him," is entirely insufficient at this late stage in the proceedings.   See Response at 17 n.4.

[6] Essick maintains that this conversation occurred in December 2008.   See Essick Decl. ¶ 13.   However, Thomas testified that he is certain this conversation occurred while Essick was still employed at FNIS.   See Thomas Dep. at 13-14.   Thomas remembers being surprised that Essick was still employed at FNIS because "the integration activity should have been completed by then," and told Essick to be careful because "they were not his friends."   Id. at 8, 13-14.   Nonetheless, because this matter is before the Court on Defendant's Motion, the Court will view this disputed fact in the light most favorable to Essick and accepts for purposes of this Motion, that the conversation occurred in December 2008.

from FIS for "performance reasons," but because Thomas was not experiencing the same issues with Essick, he had doubts about the validity of what they stated and did not terminate Essick as requested.  Id. at 10-11.  After learning this information from Thomas, Essick began reviewing the records that he had retained in his possession from his time at FIS, and found chat logs containing conversations between his former co-workers about Essick.  See P. Dep. 2 at 31, 87-88, 105; P. Dep. 1 at 8-9.[7]

Although the chat logs contain no direct or indirect references to Essick's race or his HR Complaint, they do show that his co-workers, especially his supervisor Gouin, did not like Essick, thought he did not work hard, and did not think he was good at his job.  See P. Dep. 1 at 125-72, Ex. A.  The most significant portion of the chat logs show that in March of 2004, Gouin and others were keeping track of Essick's work and documenting any issues that arose.  See Essick Decl., Ex. A at 1, 3.  One member of the team, Jennifer Rahman, told Gouin that she kept a file on Essick and was willing to provide that information to Cato, Essick's supervisor at the time.  See Essick Decl., Ex. A at 1.  Gouin told Rahman that by sharing this information she was "making [Cato] very happy."  See Essick Decl., Ex. A at 1-2.  The conversation shows that Winters, the supervisor whom Essick accused of race discrimination, was involved in the decision to monitor Essick's work.  Id. at 1 (Gouin to Rahman: "[Winters] is suppose to let me know to monitor it, and if [Essick] does drop the ball then we escalate to his manager [Cato]. . . . and between you and me, they are looking.").  In addition, a conversation between Gouin and Johnson on April 28, 2004, shows that Bridget Farris and Mike Flynn were included in some of the discussions about

---

[7] Essick was the administrator over the instant messaging system when he worked at FIS, and, as part of his duties, he "backed up all data" and kept it with him in case of disaster.  See P. Dep. 1 at 8-9.  Thus, Essick maintains he was authorized to have this information on a portable hard drive in his possession.  Id.

Essick.  See id., Ex. A at 3.[8]  The chat logs contain a January 2005 conversation between Gouin and one of the team members, John Lokietek, in which Lokietek expresses his disagreement with some aspects of Gouin's assessment of Essick's work and his discomfort with the prospect of being questioned by Lander about Essick's evaluation.  See id., Ex. A at 8.  He also cautions Gouin that she is "playing with a much hotter fire than [she] may be aware of."  Id.  At one point in February of 2005, Gouin asked Don Witt to show her how to monitor the length of time Essick was away from his computer, as they had previously done with Silvia Horan, the other minority employee.  See id., Ex. A at 10; P. Dep. 1 at 165-66.

Based on the information Thomas shared with Essick, as well as Essick's review of the chat logs, Essick filed a charge with the Equal Employment Opportunity Commission (EEOC) on approximately February 2, 2009.  See P. Dep. 1 at 77-78; P. Dep. 2 at 86-88, Ex. 33.  On August 12, 2013, the EEOC issued a Letter of Determination in which it found evidence of discrimination and retaliation against Essick.  See Essick Decl. ¶ 18, Ex. C. The EEOC later issued a Notice of Right to Sue, and Essick initiated this action on July 7,

---

[8] This portion of the chat log, dated April 28, 2004, reads as follows:

Gouin: "have you by chance heard anything from bridget or mark cato on the domino admin issue regarding on going system support (ie. greg)??"
Johnson: "she is working on it.  Greg saw her yesterday and asked her for a status…"
Johnson: "She was filled with all the verbal accusations she had heard about Greg."
Johnson: "I told her that all vaporizes when you ask people to provide examples"
Johnson: "John feels he knows what he is doing, and he works closest to him."
Gouin: "[I] know cato is having some conversations with mike and bridget was brought into that as well"
Johnson: "She is going to have Mark document anything of claims that are being made."
Johnson: "same with you. If you gave Mark some verbal stuff to put into his review, you need to back it up with examples"
Gouin: "yes, [I] agree, but at this point his knowledge of web and development put him second to john"
Johnson: "that is ok"
Johnson: "those [aren't] the destructive claims I am referring to"
Gouin: "[I] sent mark all the documentation that [I] had about a month ago, when he asked"

Essick Decl., Ex. A at 3.

2014.  See Complaint (Doc. 1); see also Answer ¶ 13.  In his Amended Complaint, Essick alleges that Defendant violated Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and the Florida Civil Rights Act (FCRA), Fla. Stat. § 760.01 et seq., by discriminating against Essick on the basis of race (Count I) and retaliating against him for engaging in protected conduct (Count II).  See generally Amended Complaint.[9]

## III.   Discussion

A prerequisite to bringing suit under Title VII is the timely filing of a charge of discrimination.  Davis v. Polk Cnty. Sheriff's Office, 170 F. App'x 598, 600 (11th Cir. 2005) (citing Maynard v. Pneumatic Prods. Corp., 256 F.3d 1259, 1262 (11th Cir. 2001)).  In cases involving discrete discriminatory acts such as termination, failure to promote, denial of transfer, or refusal to hire, the discriminatory act occurs on the day that act happens.  Thomas v. Ala. Council of Human Relations, Inc., 248 F. Supp. 2d 1105, 1115 (M.D. Ala. 2003).  And, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).  Under 42 U.S.C. § 2000e-5(e)(1), a claimant must file a charge of discrimination with the EEOC

> within one hundred and eighty days after the alleged unlawful employment practice occurred . . . except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful

---

[9] On June 6, 2016, Essick filed Plaintiff's Motion for Leave to Amend Complaint to Assert a Claim of Punitive Damages (Doc. 46; Motion to Amend).  Defendants oppose the Motion to Amend noting that it was filed well beyond the deadline to amend pleadings, Essick has failed to show good cause, and he unduly delayed in seeking to amend.  See Defendants Fidelity National Information Services, Inc. and Certegy, Inc.'s Response Opposing Plaintiff's Motion for Leave to Amend Complaint to Assert Claim for Punitive Damages (Doc. 52; Response to Motion to Amend).  Additionally, Defendants assert that the amendment would be futile and allowing it at this late date would prejudice Defendants.  Id. at 9-19.  Although the Court would likely agree that the Motion to Amend is untimely and that there has been no showing of good cause, because the Court determines summary judgment is due to be granted in Defendants' favor, the Motion to Amend will be denied as moot.

employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier.

42 U.S.C. § 2000e-5(e)(1).  Because Florida is a deferral state,[10] an employee must file a charge "within 300 days of the last discriminatory act."  Davis, 170 F. App'x at 600.  As such, a Title VII claimant "can only file a charge that covers discrete acts that 'occurred' within the appropriate time period" - here, within 300 days of each alleged incident of discrimination.[11]  Morgan, 536 U.S. at 114.  Additionally, under the FCRA, an employee may file an administrative complaint with the Florida Civil Rights Commission within 365 days of the alleged violation.  See Fla. Stat. § 760.11; see also Wolf v. MWH Constructors, Inc., 34 F. Supp. 3d 1213, 1222 (M.D. Fla. 2014).

In this case, Essick's employment with Defendant ended on April 13, 2007.  See Essick Decl. ¶ 12; P. Dep. 2, Ex. 32.  As such, any discriminatory or retaliatory actions purportedly taken against Essick ended at that time.[12]  Thus, Essick had until February 7,

---

[10] A deferral state is one that "prohibit[s] the unlawful employment practice at issue and [has] established state or local authorities to grant or seek relief for such practice."  See Davis, 170 F. App'x at 600 n.2 (quoting Maynard, 256 F.3d at 1262-63).

[11] Nevertheless, "[t]he existence of past acts . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."  Morgan, 536 U.S. at 113.  Additionally, the statute does not "bar an employee from using the prior acts as background evidence in support of a timely claim."  Morgan, 536 U.S. at 113.

[12] Essick's Response references the continuing violation doctrine as a basis for finding that his claims are timely.  See Response at 14-15.  "The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim where at least one other violation occurred within the statutory period."  See Brooks v. CSX Transp., Inc., 555 F. App'x 878, 880 (11th Cir. 2014).  "However, the doctrine does not apply to discrete acts of discrimination, such as a promotion denial or refusal to hire."  See id.; see also Morgan, 536 U.S. at 114 (listing easily identifiable examples of discrete acts as "termination, failure to promote, denial of transfer, or refusal to hire").  Moreover, a discrete act of discrimination does not constitute a continuing violation merely because it continues to adversely affect an employee, nor does an employer's refusal to rectify a past violation create a continuing violation.  See Ross v. Buckeye Cellulose Corp, 980 F.2d 648, 658 (11th Cir. 1993).  Here, Essick fails to offer any argument or analysis explaining how the actions at issue in this lawsuit, i.e., the discrimination referenced in the HR Complaint, the FIS evaluations, the 2005 "constructive" termination, the FNIS evaluation, and the 2007 termination, could constitute "continuing violations."  Regardless, even if Essick endured some "continuing violation" during his employment with Defendant, such a violation last occurred when Essick left FNIS on April 13, 2007.  Although Essick alleges that Defendant

2008, for purposes of Title VII, and April 13, 2008, under the FCRA, to file a timely charge challenging his termination. Essick did not file his charge of discrimination and retaliation with the EEOC until February 2, 2009, over 650 days later. See P. Dep. 2, Ex. 33. Therefore, the charge was not timely filed under Title VII or the FCRA. See Bourne v. Sch. Bd. of Broward Cnty., 508 F. App'x 907, 909 (11th Cir. 2013).[13]

This does not end the Court's inquiry, however, because "the statutory time limits applicable to lawsuits against private employers under Title VII are subject to equitable tolling." See Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990); Bourne, 508 F. App'x at 909.[14] The Eleventh Circuit instructs that "[u]nder equitable tolling, Title VII's statute of limitations period does not start to run until a plaintiff knew or reasonably should have known that [he] was discriminated against." See Carter v. West Publ'g Co., 225 F.3d 1258, 1265 (11th Cir. 2000); Bourne, 508 F. App'x at 910. Stated another way, "a limitations period does not start to run until the facts which would support a charge of

---

provided negative references about him to his employer in 2008, as noted above, Essick submits no admissible evidence to support this allegation so the Court will not consider it. See supra note 5.

[13] The Court also finds that Essick failed to comply with Florida's statute of limitations applicable to claims under the FCRA. Specifically, the FCRA "contemplates that the [Florida Civil Rights Commission] will investigate the complaint and submit a decision within 180 days, determining whether there is reasonable cause to support the claim." See Ross v. Jim Adams Ford, Inc., 871 So. 2d 312, 315 (Fla. 2d Dist. Ct. App. 2004) (citing Fla. Stat. § 760.11(3)). Where the Commission issues a determination supporting the claimant, that person has one year to file a lawsuit, see Fla. Stat. § 760.5(11), but if the Commission fails to timely process a charge, the claim is still subject to Florida's four-year statute of limitations for actions based on statutory liability. See Ross, 871 So. 2d at 315; see also Joshua v. City of Gainesville, 768 So. 2d 432, 439 (Fla. 2000) ("[T]he statute of limitations for causes of action based on statutory liability, section 95.11(3)(f), applies to situations where the Commission has not made a reasonable cause determination within 180 days."). Essick initiated this lawsuit on July 7, 2014, over seven years after his April 13, 2007 termination.

[14] Defendant argues that Essick's FCRA claims are not subject to equitable tolling under Florida law. See Motion at 12 n.5. Because the Court concludes that Essick is not entitled to equitable tolling regardless, the Court need not address whether the equitable tolling doctrine is recognized under Florida law. Compare Starling v. R.J. Reynolds Tobacco Co., 845 F. Supp. 2d 1215, 1236-40 (M.D. Fla. 2011) (finding that Florida law recognizes the equitable tolling doctrine) with Pierson v. Orlando Reg'l Healthcare Sys., Inc., No. 6:08-cv-466-Orl-28GJK, 2010 WL 1408391, at *15 (M.D. Fla. Apr. 6, 2010) ("Equitable tolling . . . is not available in civil actions in Florida. Section 95.051(1), Florida Statutes, sets forth a list of events that toll a statute of limitations, and equitable tolling is not among them.") aff'd 451 F. App'x 862 (11th Cir. 2012).

discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights." See Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025 (11th Cir. 1994) (citing Reeb v. Econ. Opportunity Atlanta, Inc., 516 F.2d 924, 931 (5th Cir. 1975)). Although "mere suspicion" of discrimination is insufficient to trigger the start of the limitations period, equitable tolling ceases once the employee has knowledge of facts sufficient to support a prima facie case of discrimination. See id. at 1026; see also Smith v. Potter, 310 F. App'x 307, 310 (11th Cir. 2009) ("This court has explained that equitable tolling is appropriate until the point at which the plaintiff has 'knowledge of facts sufficient to support a prima facie case of . . . discrimination.'" (citation omitted)). Notably, "[i]t is not necessary for a plaintiff to know all the facts that support his claim in order to file a claim." See Sturniolo, 15 F.3d at 1025.

Moreover, equitable relief is extended only sparingly, and is generally inappropriate "where the claimant failed to exercise due diligence in preserving his legal rights." See Irwin, 498 U.S. at 96; see also Abram v. Fulton Cnty. Gov't, 598 F. App'x 672, 675 (11th Cir. 2015) ("Equitable tolling is not warranted where the plaintiff failed to exercise due diligence or where [he] failed to file [his] action in a timely fashion, despite knowing (or being in a position to know) that the limitations period was running."). Nonetheless, "tolling may be warranted where the defendant misled the plaintiff into allowing the statutory limitations period to lapse or where the plaintiff had no reasonable way of discovering the wrong perpetrated against [him]." See Abram, 598 F. App'x at 675; see also Bourne, 508 F. App'x at 910 ("'[T]raditional equitable tolling principles require a claimant to justify her untimely filing by a showing of extraordinary circumstances,' such as fraud, misinformation, or deliberate concealment." (quoting Jackson v. Astrue, 506 F.3d 1349, 1353, 1355 (11th

Cir. 2007))). "The purpose of this rule is to prevent employers from escaping . . . liability by giving victims pretextual, nondiscriminatory reasons for the employer's action." <u>See</u> <u>Smith</u>, 310 F. App'x at 310. Essick bears the burden of establishing that equitable tolling is warranted in this case. <u>Carter</u>, 225 F.3d at 1265.

Here, Essick does not assert that Defendant engaged in any fraud, deliberate concealment or misinformation within the meaning of the equitable tolling doctrine. Rather, Essick maintains that equitable tolling is appropriate because he was unaware of the facts which supported his claims until December 2008, when he spoke with Thomas. <u>See</u> Response at 17. Essick argues that he "took immediate action upon learning of the facts underlying the basis for his claim from Don Thomas," and maintains that "[d]espite beliefs and suspicions (even a feeling of 'knowing') prior to that time, [Essick] had no clear proof until then." <u>Id.</u> However, for the reasons set forth below, Essick's decision to wait until he had "clear proof" before filing his claims renders his reliance on equitable tolling unavailing. Indeed, because Essick knew, or should have reasonably known, the basis for his discrimination and retaliation claims within the limitations period, application of the equitable tolling doctrine to save his untimely claims would be improper.

Turning first to Essick's discrimination claim, Essick plainly knew or had reason to know of the facts forming the basis of this claim several years prior to filing the EEOC charge. A plaintiff establishes a <u>prima</u> <u>facie</u> case of discrimination under Title VII by showing: "(1) [he] is a member of the protected class; (2) [he] was subjected to adverse employment action; (3) [his] employer treated similarly situated [white] employees more favorably; and (4) [he] was qualified to do the job." <u>McCann v. Tillman</u>, 526 F.3d 1370, 1373 (11th Cir. 2008) (citation omitted) (fourth alteration in original). Essick's race

discrimination claim is premised solely on Winters' purported discrimination against Essick prior to Essick filing the HR Complaint. See Response at 3, 19. Essick contends that his supervisor, Jason Winters, treated him unequally as compared to other white co-workers in the provision of training opportunities and equipment. See P. Dep. 1 at 48. Essick also perceived that he and the one other minority employee in the department were treated differently by their co-workers. See id. at 49. Essick raised these specific issues in the HR Complaint dated December 24, 2003. Thus, Essick was in possession of facts, at that time, demonstrating a prima facie case of race discrimination, specifically, that, as a minority employee, he suffered adverse action and his employer treated similarly situated white employees more favorably than him. Essick does not offer any justification for his failure to file a charge of discrimination at that time, and thus, his race discrimination claim is not subject to equitable tolling. See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1435-36 (11th Cir. 1998) (rejecting the application of equitable tolling for an age discrimination claim where plaintiff, while employed in the subject department, "protested vigorously against his failure to receive the same training opportunities offered to his younger co-workers"). Accordingly, the Court will grant summary judgment in favor of Defendant and against Essick on Count I of the First Amended Complaint.

With respect to Essick's retaliation claims, "[a] prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." See Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). While at FIS, Essick was plainly aware that he engaged in protected conduct, i.e., the filing of the HR Complaint, and that

he was subjected to adverse employment actions—the negative evaluations and final warning leading to his "forced" resignation in 2005.  Thus, equitable tolling would only be appropriate in these circumstances if Essick had no reason to believe, until talking to Thomas and reading the chat logs in 2008, that the negative evaluations and warnings were causally related to the HR Complaint.  <u>Cf. Clark v. Potter</u>, No. 5:07cv41/RS/EMT, 2008 WL 186619, at *4 (N.D. Fla. Jan. 18, 2008) (finding that the limitations period on plaintiff's retaliation claim did not begin to run until plaintiff learned that another employee, who had not engaged in protected activity, was not terminated despite committing the same misconduct for which plaintiff was terminated).

However, Essick openly maintains that he believed he was being retaliated against at the time that he received the negative evaluations and warnings.  <u>See</u> P. Dep. 2 at 10-11, 36-37, 46-50 ("At that point in time everything they were doing to get me fired I knew was retaliation, in my mind.  I had no proof, but I believed it. . . . I clearly thought that they were retaliating against me, without question.").  Indeed, Essick complained to FIS that he was subjected to retaliatory conduct with respect to at least one negative evaluation, <u>see</u> P. Dep. 2 at 36-37, Ex. 8, as well as the final warning, <u>see</u> P. Dep. 2 at 10-11 ("Q.  My only point is, once you got that final warning in May of 2005, you responded to your superiors or someone at FIS that you thought that warning was part of a pattern of retaliation?  A. Exactly, yes.").  In response to his 2004 Annual Review, prepared by Gouin, Essick wrote that there was no "justifiable business reason" for the evaluation, and that Johnson, a manager over that area, strongly disagreed with Gouin's assessment.  <u>See</u> P. Dep. 2 at 48-49, Ex. 14.  Thus, during his employment with FIS, Essick was aware that after he filed his HR Complaint he received negative evaluations that he felt were completely unjustified,

and on at least one occasion, a manager agreed that the evaluation was unfair.  Essick concluded, at that time, that he was being retaliated against because his co-workers treated him differently immediately after filing the HR Complaint, he "was getting false write-ups," and he "was having people that formerly were my friends not wanting to associate with me."  See P. Dep. 1 at 45-46.

In light of the foregoing, the Court finds that Essick had sufficient information at the time of his employment with FIS to support a charge of retaliation.  Essick strongly believed that the negative evaluations and final warnings were unwarranted and resulted from his HR Complaint, and complained of this perceived retaliation to FIS.  Essick's contention that he did not have "proof" until he reviewed the chat logs is unavailing.  Essick presents no authority to suggest that the limitations period is tolled until such time as an employee obtains clear proof of his Title VII claim.  Indeed, the Eleventh Circuit instructed in Ross v. Buckeye Cellulose Corp., 980 F.2d 648 (11th Cir. 1993) that the application of equitable tolling is contingent on whether the claimant knew or should have known of the allegedly unlawful conduct, not whether he "had enough evidence to prosecute successfully [his] . . . claims at trial."  See Ross, 980 F.2d at 660 n.19.  As explained in Ross, "once [Essick] finally brought [his] Title VII action[], [he was] able to take advantage of 'liberal civil discovery rules [that] give plaintiffs broad access to employer's records in an effort to document [his] claims.'"  Id. (citation omitted).  While Essick is correct that "mere suspicion" of unlawful treatment does not necessarily trigger the limitations period, this is not a case where an employee accepted a facially valid reason for an adverse employment action and only later discovered that the reason was false.  Cf. Sturniolo, 15 F.3d at 1025-26 ("At the time of his discharge, Sturniolo believed Barry's reasons for terminating him were business

related and Sturniolo was not aware of Sheaffer's intent to hire a younger individual to replace him."); Clark, 2008 WL 186619, at *3 ("Equitable tolling has been applied numerous times when an employee thinks they are being terminated for legitimate business reasons only to find out after the statutory time has run that their employer hired a younger employee as a replacement.") (collecting cases).  Here, Essick actually believed from the outset that the warnings and evaluations were unjustified and retaliatory.  Even if Essick did not "know all the facts regarding the mechanisms" of the retaliation, equitable tolling is inappropriate because Essick was aware of sufficient information indicating that FIS was violating his right to be free of retaliation in his employment.  See Ross, 980 F.2d at 660.

Regardless, even if Essick did not have sufficient information to support a claim of retaliation until his review of the chat logs, to avail himself of the equitable tolling doctrine, Essick must show that he acted with diligence.  See Abram, 598 F. App'x at 675 (citing Justice v. United States, 6 F.3d 1474, 1479 (11th Cir. 1993)).  It is undisputed that Essick has been in possession of the chat logs since before he left his employment with FIS.  See P. Dep. 1 at 66-67.  As such, this is not a case where a plaintiff had "no reasonable way of discovering the wrong perpetrated against [him]."  See Justice, 6 F.3d at 1479.  Rather, Essick plainly believed that he was subject to unlawful retaliation at that time, and had in his possession information which, in the exercise of reasonable diligence, he could have discovered long before the expiration of the 300-day filing period.  Essick's lack of diligence in pursuing his retaliation claim against FIS precludes application of the "extraordinary remedy" of equitable tolling.  See Murphree v. Comm'r, Soc. Sec. Admin., ___ F. App'x ___, 2016 WL 827318, at *3 (11th Cir. Mar. 3, 2016); Abram, 598 F. App'x at 675

("Equitable tolling is not warranted where the plaintiff failed to exercise due diligence . . . ."); see also Irwin, 498 U.S. at 96.

Last, the Court turns to Essick's retaliation claim stemming from his time at FNIS. Essick contends that FNIS retaliated against him for the 2003 HR Complaint by reducing his evaluation from "exceeds" to "meets expectations" and converting him from a permanent to a temporary employee whose employment would end on a specific date. When Essick received the letter, after the merger, changing his status from permanent to temporary, he believed it was in retaliation for the 2003 HR Complaint. See P. Dep. 2 at 67-68. Likewise, when Gimse's evaluation of Essick was changed from "exceeds" expectations to "meets" expectations, Essick felt this was retaliation for the 2003 HR Complaint based on Flynn's involvement in the reduction of the evaluation. See P. Dep. 2 at 82-83. Nonetheless, Essick did not file a retaliation charge at that time because, although he "felt [he] was discriminated against and retaliated against; and . . . will even go so far as to say [he was] sure that was happening," he had "no solid proof." See id. at 104-05. According to Essick, it was not until Thomas told him in December of 2008 that prior to the merger, Farris and others at FIS had instructed Thomas to fire Essick, that Essick decided to examine the information in his possession, discovered the chat logs, and filed a charge with the EEOC. The Court is skeptical that this delay exemplifies the type of due diligence that is required for equitable tolling to apply. In April 2007, when Essick resigned, he was aware that he had resigned from FIS previously because he believed they were retaliating against him for engaging in protected conduct, he was aware that soon after FIS merged with Certegy his employment status was changed from permanent to temporary, and he was aware that a draft of his evaluation was changed from "exceeds" to "meets"

expectations under the influence of one of his former FIS managers. Based on these circumstances, Essick personally believed that he was once again being retaliated against by FIS management. While Essick did not know that FIS management had actually sought to have him fired, the information in his possession was sufficient to have prompted him to pursue his rights at that time. None of Essick's testimony suggests that, prior to talking to Thomas, he was under the impression that his change in status and the downgrading of his evaluation were for legitimate business reasons. Indeed, Essick testified that his conversation with Thomas only confirmed what he already knew. See P. Dep. 1 at 63. Moreover, Essick fails to explain why, given his concerns about retaliation and in the exercise of due diligence, he could not have spoken with Thomas about his concerns or examined the chat logs long before December 2008. In light of the foregoing, the Court concludes that Essick fails to meet his burden with respect to the applicability of equitable tolling to this portion of his claim. Thus, the Court will grant Defendant's Motion in its entirety.[15]

However, even if equitable tolling could apply to save Essick's claims of retaliation as to the 2007 evaluation and termination from FNIS, Defendant is still entitled to summary

---

[15] The Court notes that in its Letter of Determination, the EEOC found that "[t]imeliness and all other jurisdictional requirements for coverage have been met." See Essick Decl., Ex. C. Essick argues that this finding is entitled to "great weight." See Response at 15 n.3. However, "EEOC findings are not binding with regard to subsequent discrimination suits in federal court." See Hetherington v. Wal-Mart, Inc., 511 F. App'x 909, 912 (11th Cir. 2013); Young v. FedEx Express, 432 F. App'x 915, 917 (11th Cir. 2011) (citing Moore v. Devine, 767 F.2d 1541, 1550-51 (11th Cir. 1985) modified on reh'g, 780 F.2d 1559, 1560 (11th Cir. 1986)). Indeed, this Court is not required to "defer or make reference to the EEOC determination," because the undersigned must "conduct a de novo review of the claims." See Young, 432 F. App'x at 917. As the EEOC finding on timeliness is wholly conclusory and devoid of any explanation or analysis, the Court does not find it probative in this case. Significantly, Essick does not argue that this case is governed by the holding in Ramirez v. Sec'y, U.S. Dep't of Transp., 686 F.3d 1239 (11th Cir. 2012), and because Defendant is not an agency of the federal government, Ramirez does not appear to be applicable to this case. See Bazemore v. Dynamic Security, No. 2:12cv436-MEF, 2012 WL 3543473, at *3 n.5 (M.D. Ala. July 26, 2012) adopted by 2012 WL 3544741 (M.D. Ala. Aug. 16, 2012); see also Allen v. Diebold, Inc., 807 F. Supp. 1308, 1313 (N.D. Ohio 1992).

judgment on the merits.  Under Title VII an employer is prohibited from retaliating against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  As stated above, "[a] prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  See Crawford, 529 F.3d at 970.  As with a substantive race discrimination claim, if an employer articulates legitimate reasons for its actions, a plaintiff must then "'show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct.'" See McCann, 526 F.3d at 1375 (quoting Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999)).  To establish pretext, a plaintiff must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  Id. (quoting Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004)).

With respect to the 2007 evaluation, Gimse testifies that Flynn did not instruct him to lower the evaluation, and that his decision to change his ratings from "exceeds" to "meets" expectations was based on his discussion with Flynn regarding the meaning of those ratings and Essick's work.  See Gimse Dep. at 18, 91-107, 110.  Moreover, both Gimse and Flynn maintain that they had no knowledge of Essick's 2003 HR Complaint. See Flynn Decl. ¶ 11; Gimse Dep. at 99, 112.  Essick presents no evidence demonstrating

that either of these individuals knew of the 2003 HR Complaint,[16] or rebutting Gimse's legitimate explanation of the changes to the 2007 evaluation.  In the absence of any evidence that Flynn or Gimse knew of the HR Complaint, Essick cannot establish a causal connection between his 2003 HR Complaint and the alterations to his evaluation in 2007. See Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) ("In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.").  However, even if the Court accepted Essick's speculation that Flynn knew of the HR Complaint, in light of Gimse's unrebutted explanation of the changes to the evaluation, Essick has not carried his burden of showing pretext.

---

[16] Essick argues that Flynn must have known about the 2003 HR Complaint because he was supervising Cato at FIS at the time when Essick was placed under Cato's supervision as a result of the HR Complaint. See Response at 6-7.  Essick also points to a portion of the chat log which indicates that Cato discussed with Flynn performance issues he was having with Essick.  Id.  Noticeably absent from Essick's Response, however, is any evidence that someone actually told Flynn about the HR Complaint.  Although circumstantial evidence may be used to establish a defendant's awareness of protected conduct, in this case, Essick fails to present anything beyond mere speculation that Flynn knew about the HR Complaint, and no reasonable juror could conclude based on this speculation that Flynn had knowledge of Essick's protected conduct in the face of Flynn's unequivocal denial of such knowledge.  See Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1355 (11th Cir. 1999) ("The evidence that [the decision-maker] and [human resources] spoke in the time period between [plaintiff's] participation in the investigation and [the decision-maker's] decision to terminate her shows, at most, that [human resources] could conceivably have told [the decision-maker] about [plaintiff's] participation.  But because 'could have told' is not the same as 'did tell,' it would be pure speculation to infer that [human resources] actually told [the decision-maker] about [plaintiff's] participation."); Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1198 (11th Cir. 1997) (finding insufficient evidence of knowledge where plaintiff "offered nothing more than an assertion based on a hunch that [her supervisor] informed [her employer's] vice-president of [plaintiff's] plan to file charges with the EEOC"); cf. Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993) (finding sufficient circumstantial evidence that mayor was aware of protected conduct where the councilman told plaintiff he would tell the mayor, the next morning the councilman met with the mayor, and afterward the mayor immediately called plaintiff to his office, and where mayor conceded in his deposition that he may have discussed the matter with the councilman).  As stated in Raney, "[s]ummary judgment cannot be avoided . . . based on hunches unsupported with significant probative evidence."  See Raney, 120 F.3d at 1198.

As to Essick's claim that his reclassification after the merger was retaliatory, even assuming he can establish a prima facie case,[17] Defendant offers evidence of a legitimate, non-discriminatory reason for the decision to end Essick's employment.  In his Declaration, Flynn explains that "[w]hen the merger occurred, the FNF entity which merged with Certegy was already using Microsoft Exchange and had migrated away from Lotus Notes, and the plan was to migrate all Lotus Notes systems to Microsoft Exchange."  Flynn Decl. ¶ 6.  Because Essick's responsibilities "involved maintenance of the Lotus Notes operating system Certegy had been using," he was notified after the merger that it was anticipated that his employment with FNIS would end on a date certain in the future," although the anticipated end date was pushed back "a couple of times due to ongoing issues with migrating from Lotus Notes to Microsoft Exchange."  Id. ¶¶ 5-7.  Significantly, the other Certegy employee who worked on the Lotus Notes operating system, Hilton Day, who is Caucasian, was also notified after the merger that his employment with FIS would end, and indeed, "[a]fter the conversion from Lotus Notes to Microsoft Exchange was substantially completed, Mr. Day's employment with FIS was terminated."  Id. ¶¶ 6-7, 11.  Essick presents no evidence to rebut or otherwise undermine this explanation for his termination.  In the absence of any evidence demonstrating that Flynn's explanation for Essick's termination was false, and that retaliation was the real reason for the employment decision,

---

[17] Although at first blush the close temporal proximity between the merger with FIS and Essick's notification of his change in employment status presents suspicious timing, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  See Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000).  Although it is unclear from the record who actually made the decision to reclassify Essick, Flynn, Thomas, Gimse and Herranz, the only individuals with any apparent involvement in Essick's reclassification, all deny any knowledge of Essick's HR Complaint.  See Flynn Decl. ¶ 11; Gimse Dep. at 99, 112; Herranz Dep. at 61-62; Thomas Dep. at 30-31; see P. Dep. 1, Ex. B; P. Dep. 2, Ex. 24.

Essick's claim must fail.  See Mealing v. Ga. Dep't of Juvenile Justice, 564 F. App'x 421, 427 (11th Cir. 2014) ("Reasons are pretextual only if (1) the reasons were false and (2) retaliation was the real reason for the employment decision.").[18]  Accordingly, it is

**ORDERED**:

1.  Defendants Fidelity National Information Services, Inc.'s and Certegy, Inc.'s Motion for Summary Judgment and Supporting Memorandum of Law (Doc. 24) is **GRANTED**.

2.  The Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants Fidelity National Information Services, Inc. and Certegy, Inc. and against Plaintiff Gregory A. Essick, Sr.

3.  Plaintiff's Motion for Leave to Amend Complaint to Assert a Claim of Punitive Damages (Doc. 46) is **DENIED as MOOT**.

4.  The Clerk of the Court is further directed to terminate any remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 6th day of July, 2016.

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties

---

[18] The Court notes that Essick attempts to invoke the "convincing mosaic" mechanism of establishing an issue of fact concerning an employer's discriminatory or retaliatory intent.  See Response at 20 (citing Smith v. City of New Smyrna Beach, 588 F. App'x 965, 976 (11th Cir. 2014)).  For the reasons stated above, the Court finds Essick's claims to be time-barred, but even if they were not, the Court is convinced that no reasonable juror could infer from the exceedingly speculative evidence presented here that Essick's 2007 evaluation and termination were motivated by retaliation for the 2003 HR Complaint.